RAINEY v. NEW YORK & P. S. S. CO., Limited, et al.

(Circuit Court of Appeals, Ninth Circuit. August 3, 1914.)

No. 2011.

1. ADMIRALTY (§ 1*)—FORM OF PROCEDURE—PLEADING.

In admiralty, courts determine causes on equitable principles, and treat as immaterial whether the pleading counts upon contract or tort.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 1–17; Dec. Dig. § 1.*]

2. SEAMEN (§ 9*)—CONTRACT OF HIRING—IMPLIED WARRANTY OF SEAWORTHINESS.

Under the general maritime law, in every contract of hiring of the crew, as well as of affreightment, there is an implied warranty on the part of the shipowner that the ship is seaworthy at the beginning of the voyage.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 31–33; Dec. Dig. § 9.*]

3. ADMIRALTY (§ 21*)—JURISDICTION—ACTION FOR INJURY CAUSING DEATH.

In the absence of a federal or state statute giving the right of action, a suit cannot be maintained in a court of admiralty to recover for the death of a seaman.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 218–220; Dec. Dig. § 21.*

Jurisdiction of torts, see notes to Campbell v. H. Hackfeld & Co., Limited, 62 C. C. A. 279; Monongahela River Consol. Coal & Coke Co. v. Schinnerer, 117 C. C. A. 203.]

4. SEAMEN (§ 3*)—WHAT LAW GOVERNS—AMERICAN SEAMEN ON FOREIGN SHIP.

When an American citizen signs shipping articles as seaman on a British ship, and goes on board, he is on British territory and entitled to the protection of British law in behalf of British seamen, and subject to all of its obligations and liabilities. He assumes a temporary allegiance to the flag under which he serves, and his rights, while in such service, are governed by British and not by American law.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 31–33; Dec. Dig. § 3.*]

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; C. H. Hanford, Judge.

Suit in admiralty by Mary F. Rainey, as administratrix of David L. Rainey, deceased, against the New York & Pacific Steamship Company, Limited, and W. R. Grace & Co., a corporation. Decree for respondents, and libelant appeals. Affirmed.

William H. Gorham, of Seattle, Wash., for appellant.

Hughes, McMicken, Dovell & Ramsey and Otto B. Rupp, all of Seattle, Wash., for appellees.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge. Subsequent to the filing in the court below of the libel in this case, the respective parties thereto entered into this:

"Stipulation as to Facts and Dismissal.

"It is hereby stipulated by and between the above-named libelant, W. R. Grace & Co., one of the above-named respondents, and the New York & Pacific Steamship Company, Limited, one of the above-named respondents, heretofore appearing specially and now appearing specially for the purposes of this stipulation, as follows:

"First. That the respondent New York & Pacific Steamship Company, Limited, a corporation of Great Britain, was between the 1st day of August, 1907, and the 25th day of February, 1908, the owner of the British steamship Cacique, mentioned in the libel herein.

"Second. That the respondent W. R. Grace & Co. at all times subsequent to the 1st day of August, 1907, was and still is a corporation organized and existing under the laws of the state of Connecticut and doing a shipping business and maintaining an office in the city of Seattle, state of Washington.

"Third. That at all times between the 1st day of August, 1907, and the 25th day of February, 1908, the respondent W. R. Grace & Co. was the charterer of said steamship Cacique under a charter party from said New York & Pacific Steamship Company, Limited, as owner, whereby, for a valuable consideration, (1) said owner delivered to said charterer the possession, command, and navigation of the entire vessel Cacique aforesaid, for and during the voyage mentioned and described in said libel, and (2) said charterer, as owner pro hac vice, manned (including the hiring and appointment of the master, officers, and crew), equipped, supplied, navigated, and operated said vessel for and during said voyage, assuming all liabilities and making all necessary disbursements therefor, and collecting the earnings of said vessel for and during said voyage for its own proper use and benefit.

"Fourth. That said libel may be dismissed as to the respondent New York & Pacific Steamship Company, Limited, without costs to either party, with prejudice."

Such dismissal was entered, and the libel thereupon amended. Subsequently a second amended one was filed, to which exceptions were taken by W. R. Grace & Co., and, the libelant declining to further amend, a decree was entered dismissing the libel, from which decree the present appeal was taken.

In substance the second amended libel alleges that the libelant is a citizen and resident of the state of Washington, the widow and sole heir at law of David L. Rainey, deceased, the administratrix of his estate, and sues the said W. R. Grace & Co. for her own benefit to recover damages growing out of the alleged death on the 25th day of February, 1908, at the port of Mollendo, Peru, of the said David L. Rainey, her husband; that the New York & Pacific Steamship Company, Limited, a corporation of Great Britain, was at all times between the 1st day of August, 1907, and the 25th day of February, 1908, the registered owner of the British steamship Cacique, and that at all times subsequent to August 1, 1907, the said W. R. Grace & Co. was, and still is, a corporation duly organized and existing under the laws of the state of Connecticut and doing a shipping business and maintaining an office in the city of Seattle, state of Washington; that at all times between the said 1st day of August, 1907, and February 25, 1908, Grace & Co. was the charterer of the steamship mentioned, under a charter party from the New York & Pacific Steamship Company, Limited, as owner, whereby, for a valuable consideration, the said owner delivered to the charterer the possession, command, and navigation of the entire vessel for and during a voyage "from the port of Seattle, Wash., to a

port or ports in Peru, South America, and return to the Pacific coast of the United States," and that the said charterer, "as owner pro hac vice, manned, including the hiring and appointment of the master, officers, and crew, equipped, supplied, navigated, and operated said vessel for and during said voyage, assuming all liabilities, and making all necessary disbursements therefor, and collecting the earnings of said vessel for and during said voyage for its own proper use and benefit," and thereafter, on or about September 1, 1907, as such charterer and owner pro hac vice dispatched the said vessel on the said voyage; that on or about September 1, 1907, and for a long time prior thereto, and at all times thereafter until his death on the said 25th day of February, 1908, the said David L. Rainey was a citizen of the United States and a resident of the city of Seattle, state of Washington, and during all of that time was duly licensed by the United States government, as well as by the British government, as chief engineer of ocean-going United States and British steamships, respectively; that on or about September 1, 1907, at Seattle, Wash., the said charterer, through its managing agent there, engaged Rainey as chief engineer of the steamship Cacique, then being in the waters of Puget Sound in the state of Washington, for a voyage then about to be commenced from a port on Puget Sound to a port or ports in Peru and return to the Pacific Coast of the United States, pursuant to which engagement Rainey "signed shipping articles, British form, to serve in the capacity of chief engineer of said vessel for said voyage, and for a term not to exceed —— months," at certain specified wages, and thereafter, on or about September 1, 1907, said Rainey reported on board the ship to the master thereof, and entered upon and continued in the discharge of his duties as such chief engineer until his death; that at no time from the entry of Rainey upon his employment to the time of the injury which resulted in his death was the ship mentioned in a seaworthy condition; "that said steamship was what is known as an oil-burner, using oil as fuel for the purpose of generating the steam used in propelling said steamship, in operating winches for handling her cargo, and in operating an electric dynamo to illuminate said vessel, its passageways on, between, and below decks, and its several decks, so as to enable its crew, including said David L. Rainey, to perform their several duties required of them from time to time; that the feed pump on said steamship, used for supplying oil as fuel for the purposes aforesaid, was liable to become clogged with oil, fail to supply sufficient or any oil for fuel purposes, and would require to be put in working order again before the work of the vessel could go on, which was or should have been known to respondent; that said steamship was not furnished or supplied with safety lamps or any other method of illumination (exclusive of its electric plant) from which the volatile fumes of said fuel oil, wherever present on board said steamship, would be protected and ignition therewith thereby prevented, when said dynamo was for any reason out of commission and other means of illuminating had to be resorted to to enable the crew, including its chief engineer, to do the work necessary aboard said vessel;" that on the 30th day of January, 1908, at the port of Mollendo, Peru, and while Rainey was performing his duties as chief engineer, through no fault of his or of any member of the crew immediately under his

authority, a feed pump on board the ship, used for the purpose of supplying oil for fuel generating steam, became clogged, and failed to supply sufficient or any oil to keep up or generate any steam for the purposes of the ship, in consequence of which its dynamo was immediately put out of commission; that it thereupon became necessary and the duty of Rainey to immediately put the pump in working order in order to generate and keep up the steam, and the dynamo running in order to illuminate the ship, to the end that the work of the crew and of the vessel might proceed, and that in the prosecution of that duty Rainey was obliged, for want of other methods of illumination, to use and did use a lantern furnished by the charterer, which was what is known as a Dietz lamp, an oil lamp with its flame unprotected; that in doing so the volatile fumes of the oil arising from the oil in the feed pump became ignited by the flame of the lantern, thereby causing an explosion, which inflicted burns upon Rainey, from the effects of which he died the following 25th day of February, 1908, in the hospital at Mollendo, Peru, all of which was caused by the failure of the charterer to keep and maintain the said ship in a seaworthy condition.

In the libel the cause is designated as one "of tort, civil and maritime," and, besides allegations bearing upon the question of the amount of damages, it contains these further averments:

"That the laws of the United States in force at all of said times between the 1st day of August, 1907, and the 30th day of January, 1908, provided, inter alia, that in every contract of service, express or implied, beween the owner of a ship and the master or any seaman thereof, there is implied, notwithstanding any agreement to the contrary, an obligation on the owner of the ship that the owner of the ship shall provide a seaworthy ship for the voyage at the time of the commencement of the voyage, and shall keep said ship in a seaworthy condition for the voyage during the voyage; and that the laws of Great Britain in force at all times between the 1st day of August, 1907, and the 30th day of January, 1908, provided, inter alia, as follows: 'In every contract of service, express or implied, between the owner of a ship and the master or any seaman thereof, and in every instrument or apprenticeship, whereby any person is bound to serve as an apprentice on board any ship, there shall be implied, notwithstanding any agreement to the contrary, an obligation on the owner of the ship that the owner of the ship, and the master, and every agent charged with the loading of the ship or the preparing of the ship for sea or the sending of the ship to sea, shall use all reasonable means to insure the seaworthiness of the ship for the voyage at the time when the voyage commences, and to keep her in a seaworthy condition for the voyage during the voyage.' 57 and 58 Vict. c. 60, commonly known as the Merchants' Shipping Act, 1894, and acts amendatory thereof."

It will be seen from the foregoing that the gist of the cause sued on is the alleged failure of the charterer as owner pro hac vice to provide a safety lamp, for lack of which the vessel is alleged to have been unseaworthy.

[1] Whether the libel sounds in tort or contract we deem immaterial. In admiralty, courts determine causes upon equitable principles, and treat as immaterial whether the pleading counts upon contract or tort. California-Atlantic S. S. Co. v. Central Door & Lumber Co. (C. C. A.) 206 Fed. 5, 7, and cases there cited. See, also, 2 Parsons, Shipping and Admiralty, 369.

Nor do we regard it as important that in the libel it is alleged:

"That the laws of the United States in force at all of said times between the 1st day of August, 1907, and the 30th day of January, 1908, provided, inter alia, that in every contract of service, express or implied, between the owner of a ship and the master or any seaman thereof, there is implied, notwithstanding any agreement to the contrary, an obligation on the owner of the ship that the owner of the ship shall provide a seaworthy ship for the voyage at the time of the commencement of the voyage, and shall keep said ship in a seaworthy condition for the voyage during the voyage."

Conceding the correctness of the contention of the proctors for the appellee that the meaning of that allegation is that there was a United States statute to that effect, the respective proctors are agreed that, as a matter of fact, there is not and was not any such statute. There is, however, in the United States statutes, this provision:

"If any person knowingly sends or attempts to send or is party to the sending or attempting to send an American ship to sea, in the foreign or coastwise trade, in such an unseaworthy state that the life of any person is likely to be thereby endangered, he shall, in respect of each offense, be guilty of a misdemeanor, and shall be punished by a fine not to exceed one thousand dollars or by imprisonment not to exceed five years, or both, at the discretion of the court, unless he proves that either he used all reasonable means to insure her being sent to sea in a seaworthy state, or that her going to sea in an unseaworthy state was, under the circumstances, reasonable and justifiable, and for the purposes of giving that proof he may give evidence in the same manner as any other witness." Section 4561, R. S., as amended December 21, 1898, 30 St. L. 758 (U. S. Comp. St. 1901, p. 3095).

[2] According to the general maritime law, there was an implied warranty on the part of the shipowner that the ship in question was seaworthy at the time of beginning the voyage in question. In The Edwin I. Morrison, 153 U. S. 199, 210, 14 Sup. Ct. 823, 825 (38 L. Ed. 688), the Supreme Court quoted with approval this statement of the law made by Mr. Justice Gray, on circuit, in the case of The Caledonia (C. C.) reported in 43 Fed. 681, 685:

"In every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of beginning her voyage, and not merely that he does not know her to be unseaworthy, or that he has used his best efforts to make her seaworthy. The warranty is absolute that the ship is, or shall be, in fact seaworthy at that time, and does not depend on his knowledge or ignorance, his care or negligence."

And the Supreme Court added:

"In The Glenfruin, 10 P. D. 103, 108, the same rule is thus expressed by Butt, J.: 'I have always understood the result of the cases from Lyon v. Mells, 5 East, 429, to Kopitoff v. Wilson, 1 Q. B. D. 377, to be that, under his implied warranty of seaworthiness, the shipowner contracts, not merely that he will do his best to make the ship reasonably fit, but that she shall really be reasonably fit for the voyage. Had those cases left any doubt in my mind, it would have been set at rest by the observations of some of the peers in the opinions they delivered in the case of Steel v. State Line Steamship Co., 3 App. Cas. 72.' "

See, also, Corsar v. J. D. Spreckels & Bros. Co., 141 Fed. 260, 264, 72 C. C. A. 378, and cases there cited.

A fortiori does the same rule apply in cases where the lives of passengers or crew are involved. So if, instead of the injuries to Rainey

having resulted in his death, he had survived and had brought a libel for damages for the injuries he received, and it be true that the failure of the owner to equip the ship with safety lamps rendered her unseaworthy, he could undoubtedly have recovered.

[3] But Rainey died from the effects of his injuries, and, according to the well-established rule, neither his widow nor any one else can maintain a suit in admiralty in a court of the United States to recover damages growing out of his death, in the absence of an act of Congress or a statute of a state giving a right of action therefor. The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, 30 L. Ed. 358, and cases there cited. It is not contended that there is any such act of Congress. The state of Connecticut, of which state the appellee W. R. Grace & Co. is a corporation, has a statute to that effect, but, even if it ever had any application to the present case, it is conceded by the proctor for the appellant that the present suit falls within the bar of that statute.

The state of Washington, of which state the deceased Rainey was at the time of his death a citizen, and where he signed the shipping articles and became a member of the crew of the ship in question, also has a similar statute authorizing the commencement of such an action at any time within three years from the accruing of the right thereby created, within which time the present suit was brought. But we are unable to see that the statute of Washington has any application to the case. A state statute has force only within the confines of the state.

[4] The chartering of the ship in question to an American corporation for the particular voyage in question did not deprive the ship of its nationality. When Rainey, although a citizen of the state of Washington, went before the British consul at Seattle and signed the shipping articles, and thereupon stepped upon the British ship flying the British flag as a member of its crew, as the record shows he did, he stepped upon British territory and became entitled to the protection and benefit of all British law in behalf of British seamen, and subject to all of its obligations and liabilities. It is well to repeat the interesting discussion of that subject by the Supreme Court in the case In re Ross, reported in 140 U. S. 453, 472, 11 Sup. Ct. 897, 903 (35 L. Ed. 581):

"The position that the petitioner, being a subject of Great Britain, was not within the jurisdiction of the consular court is more plausible, but admits, we think, of a sufficient answer. The national character of the petitioner, for all the purposes of the consular jurisdiction, was determinable by his enlistment as one of the crew of the American ship Bullion. By such enlistment he becomes an American seaman—one of an American crew on board of an American vessel—and as such entitled to the protection and benefits of all the laws passed by Congress on behalf of American seamen, and subject to all their obligations and liabilities. Although his relations to the British government are not so changed that, after the expiration of his enlistment on board of the American ship, that government may not enforce his obligation of allegiance, and he, on the other hand, may not be entitled to invoke its protection as a British subject, that relation was changed during his service of seaman on board of the American ship under his enlistment. He could then insist upon treatment as an American seaman, and invoke for his protection all the power of the United States which could be called into exercise for the protection of seamen who were native born. He owes for that time, to the country to which the ship on which he is serving belongs, a temporary allegiance, and must be held to all its responsibilities. The question has been treated more as a polit-

ical one for diplomatic adjustment than as a legal one to be determined by the judicial tribunals, and has been the subject of correspondence between our government and that of Great Britain.

"The position taken by our government is expressed in a communication from the Secretary of State to the British government, under date of June 16, 1881. It was the assertion of a principle which the Secretary insisted 'is in entire conformity with the principles of English law as applied to a mercantile service almost identical with our own in its organization and regulation. That principle is that, when a foreigner enters the mercantile marine of any nation and becomes one of the crew of a vessel having undoubtedly a national character, he assumes a temporary allegiance to the flag under which he serves, and, in return for the protection afforded him, becomes subject to the laws by which that nation, in the exercise of an unquestioned authority, governs its vessels and seamen. If, therefore,' he continued, 'the government of the United States has by treaty stipulation with Japan acquired the privilege of administering its own laws upon its own vessels and in relation to its own seamen in Japanese territory, then every American vessel and every seaman of its crew are subject to the jurisdiction which by such treaty has been transferred to the government of the United States. If Ross had been a passenger on board of the Bullion, or if, residing in Yokohama, he had come on board temporarily and had then committed the murder, the question of jurisdiction would have been very different. But, as it was, he was part of the crew, a duly enrolled seaman under American laws, enjoying the protection of this government to such an extent that he could have been protected from arrest by the British authorities; and his subjection to the laws of the United States cannot be avoided just at the moment that it suits his convenience to allege foreign citizenship. The law which he violated was the law made by the United States for the government of United States vessels; the person murdered was one of his own superior officers whom he had bound himself to respect and obey; and it is difficult to see by what authority the British government can assume the duty or claim the right to vindicate that law or protect that officer. The mercantile service is certainly a national service, although not quite in the sense in which that term would be applied to the national navy. It is an organized service, governed by a special and complex system of law, administered by national officers, such as collectors, harbor masters, shipping masters, and consuls, appointed by national authority. This system of law attaches to the vessel and crew when they leave a national port and accompanies them round the globe, regulating their lives, protecting their persons, and punishing their offenses. The sailor, like the soldier during his enlistment, knows no other allegiance than to the country under whose flag he serves. This law may be suspended while he is in the ports of a foreign nation, but, where such foreign nation grants to the country which he serves the power to administer its own laws in such foreign territory, then the law under which he enlisted again becomes supreme.'

"The Secretary concluded his communication with the following expression of the determination of our government: 'So impressed is this government with the importance and propriety of these views that, while it will receive with the most respectful consideration the expression of any different conviction which Her Britannic Majesty's government may entertain, it will yet feel bound to instruct its consular and diplomatic officers in the East that in China and Japan the judicial authority of the consuls of the United States will be considered as extending over all persons duly shipped and enrolled upon the articles of any merchant vessel of the United States, whatever be the nationality of such person. And all offenses which would be justiciable by the consular courts of the United States, where the persons so offending are native-born or naturalized citizens of the United States, employed in the merchant service thereof, are equally justiciable by the same consular courts in the case of seamen of foreign nationality.'

"The determination thus expressed was afterwards carried out by incorporating the doctrine into the permanent regulations of the department for the guide of the consuls of this country. Seventy-second regulation.

"The views thus forcibly expressed present, in our judgment, the true status

of the prisoner while an enlisted seaman on the American vessel, and give effect to the purpose of the treaty and the legislation of Congress. The treaty uses the term 'Americans' in speaking of those who may be brought within the jurisdiction of the consular court for offenses committed in Japan. The statute designates them as 'citizens of the United States,' and yet extends the laws of the United States, so far as they may be necessary to execute the treaty and are suitable to carry the same into effect, not only over all citizens of the United States in Japan, but also over 'all others to the extent that the terms of the treaty justify or require.'

"Reading the treaty and statute together, in view of the purpose designed to be accomplished, we are satisfied that it was intended by them to bring within our laws all who are citizens, and also all who, though not strictly citizens, are by their service equally entitled to the care and protection of the government. It is a canon of interpretation to so construe a law or a treaty as to give effect to the object designed, and for that purpose all of its provisions must be examined in the light of attendant and surrounding circumstances. To some terms and expressions a literal meaning will be given, and to others a larger and more extended one. The reports of adjudged cases and approved legal treatises are full of illustrations of the application of this rule. The inquiry in all such cases is as to what was intended in the law by the Legislature, and in the treaty by the contracting parties.

"In Geofroy v. Riggs, 133 U. S. 258 [10 Sup. Ct. 295, 33 L. Ed. 642], which was before this court at the last term, it was held that the District of Columbia, as a political community, is one of 'the states of the Union,' within the meaning of that term as used in the consular convention of 1853 with France; such construction being necessary to give consistency to the provisions of the convention, and not defeat the consideration given by France for her concession of certain rights to citizens of the United States. And in the present case, to carry out the intention of the treaty and statute in question, they will be construed to apply to all parties who are by public law, or the law of the country, entitled to be treated for the time, from their employment and service, as citizens. There are many adjudications to the effect that such character will be ascribed to parties, and they be held liable to all its consequences, and entitled to all its benefits, on other grounds than birth or naturalization.

"A statute of Henry VIII enacted that if anybody should rob or take 'the goods of the king's subjects within this realm,' and be found guilty, the party robbed should have restitution of the goods. Of this statute Sir Matthew Hale said that, 'though it speaks of the king's subjects, it extends to aliens robbed, for, though they are not the king's natural born subjects, they are the king's subjects when in England, by local allegiance.' 1 Hale's Pleas of the Crown, p. 542.

"In United States v. Holmes, 5 Wheat. 412 [5 L. Ed. 122], which is in point in the case before us, certain parties were indicted in the Circuit Court of the United States for the district of Massachusetts, and convicted of murder on the high seas. It appeared that a vessel, apparently Spanish, was captured by privateers from Buenos Ayres, and a prize crew was put on board, of whom the prisoners were a part. One of them was a citizen of the United States and the others were foreigners. The crime was committed by drowning the person, whose death was charged, by the prisoners driving or throwing him overboard. On motion for a new trial certain questions arose on which the judges were divided in opinion. One of these was whether it made any difference, as to the point of jurisdiction, whether the prisoners or any of them were citizens of the United States, or that the offense was committed, not on board of any vessel, but on the high seas. The court said that the question contained two propositions: One as to the national character of the offender and the person against whom the offense was committed; and, second, as to the place where it was committed. In respect to the first the court was of the opinion that it made no difference whether the offender was a citizen of the United States or not, adding: 'If it (the offense) be committed on board of a foreign vessel by a citizen of the United States, or on board of a vessel of the United States by a foreigner, the offender is to be considered pro hac

vice, and in respect to this subject, as belonging to the nation under whose flag he sails.'

"The case of The Queen v. Anderson, L. R. 1 Crown Cases Reserved, 161, is still more in point. There one James Anderson, an American citizen, was indicted at the Central Criminal Court in England for murder on board a vessel belonging to the port of Yarmouth, in Nova Scotia; she was registered in London, and was sailing under the British flag. At the time the offense was committed the vessel was in the river Garonne within the boundaries of the French Empire, on her way up to Bordeaux, which city is, by the course of the river, about 90 miles from the open sea. The vessel had proceeded about halfway up the river, and was, at the time of the offense, about 300 yards from the nearest shore; the river at that place being about half a mile wide. The tide flows up to the place and beyond it. The prisoner was convicted, and the case was reserved for the opinion of the court. It was contended, on behalf of the prisoner, that the court had no jurisdiction in the case because he was an American citizen and in a foreign country at the time the offense was committed; and also that section 267 of the Merchant Shipping Act, which it was said the Crown relied upon at the trial, applied only to British seamen. Mr. Justice Blackburn, in regard to this last statement, observed, 'The expression "British seamen" may mean one who, whatever his nationality, is serving on board a British ship,' and also that it had been decided 'that a ship, which bears a nation's flag, is to be treated as a part of the territory of that nation. A ship is a kind of floating island.' Counsel answered that, if it floated into the territory of another nation, it would cease to be so, and the jurisdiction of the flag would then be excluded, and that the man might have been tried in France, to which Chief Justice Bovill replied: 'Even if he might, why should not this country legislate to regulate the conduct of those on board its own vessels, or so as to have concurrent jurisdiction?' All the judges concurred in sustaining the conviction. In giving his opinion the Chief Justice said: 'There is no doubt that the place where the offense was committed was within the territory of France, and that the prisoner was therefore subject to the laws of France, which that nation might enforce if they thought fit; but at the same time he was also within a British merchant vessel, on board that vessel as a part of the crew, and, as such, he must be taken to have been under the protection of the British law, and also amenable to its provisions. It is said that the prisoner was an American citizen, but he had embarked, by his own consent, on board a British ship, and was at the time a portion of its crew. There are many observations to be found in various writers to show that in some instances, though subject to American law as a citizen of America, and to the law of France as being found within French territory, yet that he must also be considered as being within British jurisdiction as forming a part of the crew of a British vessel, upon the principle that the jurisdiction of a country is preserved over its vessels, though they may be in ports or rivers belonging to another nation.' Page 165. Mr. Justice Blackburn said: 'Where a nation allows a vessel to sail under her flag, and the crew have the protection of that flag, common sense and justice require that they should be punishable by the law of the flag.' Page 170.

"The views expressed by the Department of State, quoted above, are in harmony with the doctrine uniformly asserted by our government against the claim by England of a right to take its countrymen from the deck of an American merchant vessel and press them into its naval service. It is a part of our history that the assertion of this claim, and its enforcement in many instances, caused a degree of irritation among our people which no conduct of any other country has ever produced. Its enforcement was deemed a great indignity upon this country and a violation of our right of sovereignty; our vessels being considered as parts of our territory. It led to the War of 1812, and, although that war closed without obtaining a relinquishment of the claim, its further assertion was not attempted. At last in a communication by Mr. Webster, then Secretary of State, to Lord Ashburton, the special British minister to this country, on the 8th of August, 1842, the claim was repudiated, and the announcement made that it would no longer be allowed by our government and must be abandoned. The conclusion of Mr. Webster's

communication bears upon the question before us.  After referring to the claim of Great Britain, and demonstrating the injustice of the position and its violation of national rights, he said: 'In the early disputes between the two governments, on this so long-contested topic, the distinguished person to whose hands were first intrusted the seals of this department declared that "the simplest rule will be that the vessel, being American, shall be evidence that the seamen on board are such." Fifty years' experience, the utter failure of many negotiations, and a careful reconsideration now had of the whole subject at a moment when the passions are laid, and no present interest or emergency exists to bias the judgment, have convinced .this government that this is not only the simplest and best, but the only rule, which can be adopted and observed consistently with the rights and honor of the United States, and the security of their citizens.  That rule announces, therefore, what will hereafter be the principle maintained by their government.  In every regularly documented American merchant vessel, the crew who navigate it will find their protection in the flag which is over them.' Webster's Works, vol. 6, p. 325.

"This rule, that the vessel, being American, is evidence that the seamen on board are such, is now an established doctrine of this country; and in support of it there is with the American people no diversity of opinion and can be no division of action.

"We are satisfied that the true rule of construction in the present case was adopted by the Department of State in the correspondence with the English government, and that the action of the consular tribunal in taking jurisdiction of the prisoner Ross, though an English subject, for the offense committed, was authorized.  While he was an enlisted seaman on the American vessel, which floated the American flag, he was, within the meaning of the statute and the treaty, an American, under the protection and subject to the laws of the United States equally with the seaman who was native born.  As an American seaman he could have demanded a trial before the consular court as a matter of right, and must therefore be held subject to it as a matter of obligation."

It is not contended by the proctor for the appellant that under the general admiralty law, or even under the common law, the widow or other heir of the deceased Rainey had any right to the recovery of damages by reason of his death.

The judgment is affirmed.