THE EPSOM.

(District Court, W. D. Washington, N. D.    October 16, 1915.)

No. 3030.

1. ADMIRALTY ☞5—JURISDICTION—SUIT BY CITIZEN AGAINST FOREIGN SHIP
—RULE OF COMITY.

An American citizen, by signing shipping articles and entering on his
duties as a seaman on a foreign ship, becomes entitled to the protection
and benefit of the laws of the country of the ship's nationality; but he
does not forfeit his constitutional right to invoke the jurisdiction of
the admiralty courts of the United States to determine a dispute arising
under the shipping articles.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 69–85; Dec.
Dig. ☞5.]

2. ADMIRALTY ☞5—SUIT FOR WAGES—JURISDICTION.

A court of admiralty, taking jurisdiction of a suit for wages against
a foreign ship by one seaman, by reason of his American citizenship, will
not dismiss as to other libelants having similar claims.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 69–85; Dec.
Dig. ☞5.]

3. WAR ☞10—EFFECT ON SEAMEN'S CONTRACTS—RIGHT TO TERMINATE EM-
PLOYMENT—WAR RISKS.

Libelants, in February, 1914, in England, signed shipping articles for
three years' service as seamen on a steamship for a voyage to Seattle
and other North and South American ports. When they reached a Chili-
an port, where they laid up several months for repairs, it was learned
that war had commenced between Great Britain and Germany and
their allies, and that German cruisers were attacking merchant vessels,
and one such cruiser twice entered the port for coal. On resuming her
voyage, by direction of the officers, the ports of the steamship were dark-
ened at night to avoid being seen. After discharging, the vessel was
loaded with a cargo of flour and grain, which was contraband, destined
for London. *Held* that, under the English law, libelants were justified in
refusing to serve on the return voyage, on the ground that the risk was
not the commercial risk which their contract contemplated, and that
they were entitled to recover wages to the time they left the vessel.

[Ed. Note.—For other cases, see War, Cent. Dig. §§ 26–36; Dec. Dig.
☞10.]

In Admiralty.    Suit by Andrew Olsen, C. Calicris, Peter Alemonakis.
and Nick Trataris against the steamship Epsom.    Decree for libelants·

Libel was filed by Andrew Olsen, a citizen of the United States, and C.
Calicris, Peter Alemonakis, and Nick Trataris, subjects of Greece, against
the steamship Epsom, of British registry, for wages as seamen, alleging,
among other things, that on February 13, 1914, at the port of Newport, Moon,
England, libelants were employed by the master of the Epsom as stokers, for
a voyage to Seattle and other North and South American ports, for three
years, at £5. 10s. per month each, that they served as stokers continuously
to the time of filing the libel, and that there is due to them as wages, the
amounts stated, and then alleges (paragraph 4) "* * * that the kingdom
of Great Britain is now at war with Germany and her ally, Austria-Hun-
gary, and that by reason of said war the enemies of Great Britain are prey-
ing upon the commerce of Great Britain, and are attacking her merchant
vessels, such as the respondent herein, by torpedoes and submarines and
other instrumentalities of warfare, and that while upon the high seas and
without neutral ports the said steamship Epsom, by reason of being of Brit-

ish register, is in grave danger of being attacked, disabled, and sunk, and that the lives of these libelants and all persons aboard said steamship will be imperiled as soon as said steamship puts to sea, and particularly on her return voyage through the North Sea and the Atlantic Ocean to her home port, and that the employment and service of these libelants upon said steamship is extrahazardous and perilous, and that these libelants are fearful of remaining aboard said steamship upon her return voyage to England, which voyage it is the intention of her master and owners to attempt;" and further states that the contract of employment was entered into prior to the declaration of war, at which time they were not exposed to the hazards and perils of war; that they requested the master to release them from further service and pay them the wages due, which the master refused to do, but "insisted that they make the return voyage, notwithstanding said perils, to England"; that libelants appealed to the British vice consul at Seattle, who refused to order their discharge or the payment of their wages—and pray that the vessel may be sold to pay the wages due, with interest and costs.

Respondent appeared specially, and moved to dismiss the libel upon various grounds, which was denied, upon the ground that Olsen, being a citizen of the United States, was entitled to have the court consider his grievance. Answer was thereafter filed, in which claimant, without waiving its special appearance, denies that libelant Olsen is a citizen of the United States, but admits the other libelants are subjects of Greece, and denies practically all the remaining allegations of the libel, except that it admits that the contract was entered into as therein alleged, admits that the Epsom is a British ship, admits that Great Britain is now at war with Germany and Austria, admits libelants requested to be released from their contract, that the master refused to release them, that they appealed to the British consul, who decided they were not entitled to a discharge, and alleges, in substance, that at the time of the filing of the libel the Epsom was lying in the port of Seattle, making ready to proceed to the port of Portland, Or., there to take on a cargo of grain and flour and proceed through the Panama Canal to Colon and thence to Norfolk, Va., for orders; that the master had no knowledge of his destination after reaching Norfolk, Va., and that the steamer may never cross the North Sea or the Atlantic Ocean to her home port; that respondent has in no way breached the shipping articles; that there is no danger because of the war to libelants while the steamer is proceeding from Seattle, via Portland, to Colon, and from Colon to Norfolk; that, if libelants are fearful, it is entirely unfounded; that there is no provision in the shipping articles excepting the libelants from the dangers of war, if any; and that the laws of Great Britain, under which the contract was made, provide that seamen, shipping under articles such as those in issue, shall not be entitled to sue in any court abroad for wages unless discharged with the sanction of the laws and written consent of the master, or unless they prove such ill usage on the part of or under authority of the master as to warrant apprehension of danger to their lives, and that all seamen who shall desert the ship during period of service shall forfeit all wages then due, and, if the seaman shall refuse to proceed on the voyage which he has agreed to make, he shall forfeit the wages due him at that time; that such is the common maritime law of the world, and that none of the libelants have been so discharged, as provided by law; that libelant Olsen represented that he was a citizen of Norway; that his name appears on the shipping articles as a citizen of Norway, and the claimant and master accepted him under that belief, and if he was a citizen of the United States he falsely misled the master and claimant as to his nationality, and is estopped from asserting differently in this action.

Upon the trial the evidence established the fact that Olsen is a citizen of the United States, and, among other things, that upon the arrival of the Epsom at the port of Punta Arenas, Chili, in August, 1914, libelants and other members of the crew first learned that war had been declared between England and its allies, and Germany and its allies, and that German war vessels were preying upon English merchant ships; that the Epsom remained in port for six months making necessary repairs, and during this time libelants and other members of the crew had access to the public press and read

the comments with relation to the war, especial emphasis being given to the destruction occasioned by the Karlsruhe, Nurenberg and Dresden; that while in port the Dresden put into port twice for coal; that on the voyage from this port to Seattle, upon orders of the first mate, the portholes were covered to obscure the lights, and but one mast light was burned; that the crew maintained a lookout watch for the enemy's ships until the vessel arrived at Victoria, B. C., from which place it proceeded to Seattle. At Seattle the Greek libelants were not allowed to land by the immigration officers, and were forced to remain with the ship, and at Portland, Or., the objection being removed, they were permitted to land and returned to Seattle. When request was made to the British consul, and denied, he stated, as shown by his testimony, "At the time I told all parties there was no danger in these waters as far as we knew," and also stated, "I told them this was not the time to take up the matter, but that it should be taken up at Portland or Norfolk." Libelants understood from the officers on the ship that the vessel was bound for London, and after having loaded at Portland, Or., with a cargo of grain and flour it proceeded to London. The outward manifest shows that the vessel was bound for London. Application was made for permission to present further evidence to show that the vessel did stop at Norfolk. The application shows that the vessel did stop at the coal bunkers at Norfolk, but the testimony was not deemed material, and application was denied. Libelants did not know at the time of filing the libel that the Dresden was destroyed.

Ryan & Desmond, of Seattle, Wash., for libelants.
Huffer & Hayden, of Tacoma, Wash., for claimant.

NETERER, District Judge (after stating the facts as above). [1] The rights of the parties are determined, not by reference to any special trip, but by reason of the change of risk from commercial risk to extraordinary risk of war. The fact that there was greater danger on a voyage over waters in the German war zone does not eliminate danger over waters not included in such zone, or along the Pacific and Atlantic Oceans, washing the shores of the United States. A conclusion that there was no danger was entirely speculative, and was so considered by all parties. Claimant urges the want of jurisdiction of this court, and while this question was raised on the consideration of the motion to dismiss, no memorandum was filed, but the order was orally directed. A review of the cases cited, The Walter D. Wallett (D. C.) 66 Fed. 1011, 1012, and The Kentigern (D. C.) 99 Fed. 443, leads to the same conclusion. In The Walter D. Wallett, supra, the court stated that admiralty courts may, in their discretion, take jurisdiction in cases made by foreign seamen, but held, upon the authority of The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152, that in the absence of treaty stipulation with England, on general principles of comity, the admiralty courts of this country in such cases, except for special reasons, while not bound by, will always pay due respect to, the wishes of the foreign consul as to taking jurisdiction. That was an issue raised between a British seaman and a British ship for injury on the high seas. In The Kentigern, supra, the federal court entertained jurisdiction of an action for services of a seaman based upon his contract, broken by assault upon him by the master of a British vessel, within the police limits of the United States, although the British consul had denied libelant's request for release, and requested the court to decline jurisdiction of the matter.

The further contention that Olsen, on signing the shipping articles

on the British vessel, lost his privilege of claiming rights under the "Stars and Stripes" for wrongs suffered, but that his remedy was under the "Union Jack," and all remedy for wrongs must be asserted under the British law, and not under the law of the United States, is not determined by the citations, Ross v. McIntyre, 140 U. S. 453, 11 Sup. Ct. 897, 35 L. Ed. 581, Rainey v. N. Y. & P. S. S. Co., Ltd., 216 Fed. 449, 132 C. C. A. 509, and Leon XIII, 5 Aspinall's Reports of Maritime Cases (N. S.) 25, 73. Justice Field, in Ross v. McIntyre, supra, 140 U. S. at page 472, 11 Sup. Ct. at page 903, 35 L. Ed. 581, said:

"The national character of the petitioner, for all the purposes of the consular jurisdiction, was determinable by his enlistment as one of the crew of the American ship Bullion. By such enlistment he becomes an American seaman—one of an American crew on board of an American vessel—and as such entitled to the protection and benefits of all of the laws passed by Congress on behalf of American seamen, and subject to all their obligations and liabilities."

Judge Ross, in Rainey v. N. Y. & P. S. S. Co., supra, 216 Fed. at page 454, 132 C. C. A. 514, said:

"When Rainey, although a citizen of the state of Washington, went before the British consul at Seattle and signed the shipping articles, and thereupon stepped upon the British ship flying the British flag as a member of its crew, * * * he stepped upon British territory and became entitled to the protection and benefit of all British law in behalf of British seamen, and subject to all of its obligations and liabilities."

In The Leon XIII, supra, at page 26, it is said:

"It is, I conceive, a settled doctrine of law that, when a subject of one country enters into the service of a ship belonging to the subject of another country, he must be considered pro hac vice to be a subject of the country to which the vessel belongs."

The principle enunciated by these distinguished jurists cannot be denied, but is not applicable here, nor determinative of the issue. An American citizen, when he signs shipping articles and steps upon a British ship, flying the British flag, becomes entitled to the protection and the benefit of the British law as fully as a British subject; but he does not thereby forfeit his citizenship, nor his right to redress wrongs in the courts of his own country. The right to invoke the jurisdiction of the federal courts by a citizen of the United States for the purpose of determining a dispute under shipping articles with a foreign vessel is a constitutional right, which the courts cannot deny. The people have ordained by the Constitution that judicial power shall be vested in the national courts, and that the judicial power shall extend to all cases of admiralty and maritime jurisdiction. These provisions without doubt are for the purpose of creating a tribunal where a citizen of the United States may as a matter of right seek redress of wrongs cognizable in admiralty, and enforce legal rights. This may not be denied. It was so held by Judge Hanford, in The Falls of Keltie (D. C.) 114 Fed. 357; The Neck (D. C.) 138 Fed. 144; and the reason for taking jurisdiction is more pronounced in this case.

It is strongly urged that Olsen misrepresented his citizenship upon his employment. The master testified that Olsen misrepresented his

nationality, and that he would not have employed him, had he known he was an American citizen. It seems that, when libelant was asked his nationality, he replied that he was a Norwegian, not appreciating citizenship was required. The error can very readily be understood. Nationally he is a Norwegian; by adoption he is a citizen of the United States; and it does not appear that he knowingly intended to practice any fraud upon the master. At any rate, he is a citizen of the United States, and, if misrepresentation with relation to citizenship was made, such fact would not close the doors of the courts of the United States against entertaining jurisdiction of an admiralty wrong which he seeks to have righted under the issue in this case; and no other relief is asked against him.

[2] The court, taking cognizance of one libelant because of his citizenship, will not dismiss the other libelants, but will inquire into the grievances of all.

[3] The right of recovery depends upon the question whether the ordinary commercial contract entered into in time of peace may be abrogated by a seaman because of the extraordinary risks occasioned on account of the existence of war. Seamen cannot be relieved from a shipping contract because they do not like the "job," or because of present or anticipated conditions of the weather, or for any cause which was or could reasonably have been in the minds of the parties at the time of making the contract; nor can the master require seamen to assume greater risks than the commercial risks contemplated by the contract. The Epsom flew the British flag, was loaded with grain and flour, contraband articles, destined for London, England, sailing over waters on which had been seen by these sailors, German war vessels. It cannot be doubted that the master thought there was danger, for the lights of the vessel were hidden, and the seamen maintained a lookout watch for German war vessels. The British consul thought the request for release was premature, and should be made at Portland or Norfolk. All the evidence shows that these men acted in good faith, and that there was in their minds a probability of capture. If there was in fact no danger, that has not been established. Seamen cannot be expected to weigh with too much nicety the chances of capture, or speculate upon the movements of belligerent war vessels. The destination of the ship was London. The cargo was a London cargo. The manifest showed London to be its destination. The fact that it stopped at Norfolk, for whatever purpose, cannot serve to press the seamen into service or forfeit their wages. They agreed to serve on a voyage attended by the risks of peace, and not on a voyage attended by the risks of war.

It is conceded that the issue is governed by the English law. The crew of the Carpathian (Liston v. Owners of S. S. Carpathian, vol. 20, part. 4, Adv. Sheets of Commercial Cases, decided February 10, 1915), signed articles for a voyage to Port Arthur, Tex. Upon arrival there they learned war had been declared between Great Britain and Germany, and also that a German cruiser was in the vicinity. They refused to proceed without additional compensation, which the master agreed to pay them. When the vessel arrived in England, the owners refused to pay, upon the ground that the master had not authority to enter into

the agreement. The seamen brought suit, and the court held the master under the circumstances, was authorized to make the agreement; Lord Coleridge saying:

"It is quite clear that seamen cannot demand release from their contracts merely because they do not like the conditions under which they work, or because there is a probability of bad weather, or for some similar reason. Such things are in the minds of all the parties when they enter into these contracts. But it cannot be said that, prima facie, it is within the reasonable contemplation of parties entering into an agreement of this character that war may break out between the nation to which the owners of the ship belong and another maritime power, whose vessels may be met with on the very course the ship is destined to take. Of course, the mere fact of war breaking out might not involve a ship or her crew in any substantial risk, or indeed, in any risk at all. But here so great was the risk run by this vessel that she crossed the Atlantic without lights, and when she reached the English Channel she was diverted from her course by a British cruiser, who bade her put in at London and abstain from proceeding to Rotterdam, her port of destination. * * * The plaintiffs knew that they would not only have to cross the Atlantic, possibly within sight of the German cruiser Karlsruhe, which was in the vicinity. There was also danger from mines. * * * Then their voyage up the English Channel could not be other than fraught with peril. I am of the opinion that, while there was no certainty of danger being met with, there was every risk of it. The crew, therefore, were justified in refusing to continue the voyage without the introduction of special terms as regards wages."

In Palace Shipping Co. v. Caine et al., 76 Law Journal, 1079, Kings' Bench Division, decided in 1907, plaintiffs contracted for a three-year voyage upon the steamship Franklyn to Hong Kong and other ports. When the ship left England with a cargo of coal, Japan and Russia had been at war for more than a year. Upon arrival at Hong Kong, the seamen were told that she intended to proceed to Sasebo, a Japanese naval base. Coal had been declared contraband by Russia, and against Great Britain's protest a number of neutral ships carrying coal had been sunk. The seamen, upon refusal to proceed, were tried before the port magistrate in Hong Kong, and sentenced to imprisonment. Upon the expiration of their term they brought suit against the vessel, and the court held they were wrongfully imprisoned, and could not be compelled to proceed upon a voyage attended with risks not contemplated by their contract, and were entitled to recover their wages. Lord Loreburn, at page 1081, said:

"The master had no right to require that these men should sail for Sasebo, for the risk was not a commercial risk, nor the voyage a commercial voyage, such as the articles contemplated. The contention that there was in fact no danger of capture is not established. I cannot doubt that the owners themselves thought there was danger, and the men thought so also, and with reason. It is nothing short of preposterous to expect that seamen in a strange port shall speculate on the movements of belligerent war vessels, and nicely weigh the chances of capture."

Lord James Hereford, concurring, said:

"In determining what amounts to a justification for seamen refusing to proceed to sea, I do not think that they are called upon to prove by positive and legal evidence that there was an actual probability of capture. Their decision has to be formed upon such general information as is at the moment at their disposal. Doubtless their decision must not be based on merely arbitrary grounds. Good faith is a necessary element, and such good faith

would not exist, unless some reasonable grounds for the refusal can be alleged."

Lord Atkinson, concurring as to the right of discharge, said:

"It is, I think, equally clear that this risk of capture is not one of the risks ordinarily attending a commercial voyage or adventure of a peaceful nature. The risk of capture may be so remote that it leaves the character of such a voyage practically unchanged, or so proximate and imminent as to entirely change its character. It must be a question of degree, to be determined in each case on its own special facts. * * * It was, however, for an ordinary commercial voyage of a peaceful nature that the crew in this case engaged to serve. And, in my opinion, the burden of rebutting the prima facie presumption above mentioned, and establishing that the risk of capture was so remote that the character of the voyage remained practically unchanged from that which the crew supposed it to be when they signed the articles, rested upon the owners of the ship, or their agent, the master. I do not think that they or he discharged that burden simply by proving that, at the port from which the voyage across the theater of war was to commence, it was the opinion of the officials in a position to judge that, owing to the crippled condition of the naval forces of that belligerent by whom capture, if it was to take place, was to be apprehended, there was no real risk or danger of capture at all."

Lord Escher, in O'Neill v. Armstrong-Mitchell & Co., 65 Law Journal, 7, Queen's Bench Division, said, at page 10:

"The moment war was declared the sailors were exposed to the risks attending the infringement of the foreign enlistment act, and of being attacked by the Chinese; so that by the act of the captain's principals, the Japanese government, in declaring war, an ordinary voyage was changed into a voyage of risk. The captain was bound by that, and the seamen were entitled to say that there had been such an alteration of the circumstances of the voyage as to give them a right to leave the ship and claim the whole of the agreed wages for the voyage."

This was a case in which O'Neill engaged as a seaman aboard an English vessel for a voyage which the defendants contemplated, pursuant to an agreement with the Japanese government, to deliver a torpedo boat, constructed in England, to Japan. Before the voyage was completed, Japan declared war with China, and at the port of Aden plaintiff refused to continue the voyage. I do not think that the voyage was such as was contemplated by the agreement.

It is stipulated that the amount of wages, less deductions made, earned by the seamen on the date of the libel, was:

Andrew Olsen......................................................$207.47
C. Calicris........................................................ 221.51
Peter Alemonakis.................................................. 264.78
Nick Trataris..................................................... 255.55

Reason and justice would dictate that these seamen be released from the contract, and this is amply sustained by English authority.

A decree may be presented.