## GRAND TRUNK RY. CO. v. WRIGHT.

Circuit Court of Appeals, Sixth Circuit.
October 10, 1927.

No. 4745.

Death ⚬⟝8—Action against Canadian railroad for death on car ferry running from Windsor to Detroit held not controlled by federal Employers' Liability Act (45 USCA §§ 51–59).

Administrator's action against Canadian railroad for death of carpenter employed on ferry running from Windsor to Detroit *held* not controlled by federal Employers' Liability Act (45 USCA §§ 51–59 [Comp. St. §§ 8657–8665]), notwithstanding car ferry was registered at Detroit.

In Error to the District Court of the United States for the Eastern District of Michigan; Fred M. Raymond, Judge.

Action by David A. Wright, administrator of the estate of Douglas B. Ellis, deceased, against the Grand Trunk Railway Company (of Canada). Judgment for plaintiff, and defendant brings error. Reversed, and cause remanded for new trial.

H. R. Martin and L. J. Carrigan, both of Detroit, Mich., for plaintiff in error.

Harold H. Armstrong and George Harry Helm, both of Detroit, Mich. (Carey, Armstrong & Weadock, of Detroit, Mich., on the brief), for defendant in error.

Before DENISON, DONAHUE, and MOORMAN, Circuit Judges.

DENISON, Circuit Judge. Wright, administrator of Ellis, recovered judgment on account of Ellis' death, found to be the result of the railroad's negligence. Ellis was a carpenter employed on a car ferry running from Windsor to Detroit. Negligence, by some one, is very clear. Since the recovery is planted upon the federal Employers' Liability Act (45 USCA §§ 51–59 [Comp. St. §§ 8657–8665]), it is immaterial whether the negligence was that of a fellow servant, and we intimate no opinion as to the existence or effect of that relationship. The boat had left Windsor on a trip of some three miles down the river to the Wabash docks in the city of Detroit. When the injury occurred, it had crossed the international line and was within a half mile of its destination.

The case as first brought was based upon the Michigan Death Act (Comp. Laws 1915, §§ 14577, 14578), and involved no question of federal law. Such delays ensued that the case did not come on for trial until about seven years after it was begun. At the trial plaintiff was permitted to amend, so as to abandon reliance upon the Michigan law and depend solely upon the federal act. The defendant now complains of this permission—the statute of limitations having run in the meantime. In view of the imperfections of the original declaration in showing the facts necessary to support a resort to the federal law, it is at least not clear that the amendment was permissible. Seaboard v. Renn, 241 U. S. 290, 36 S. Ct. 567, 60 L. Ed. 1006; Hogarty v. Ry., 255 Pa. 236, 99 A. 741, 8 A. L. R. 1386; Id., 250 U. S. 650, 40 S. Ct. 12, 63 L. Ed. 1189.

However, we prefer to pass this question by without decision and come to another, viz.: Whether the federal act is applicable to the situation here shown. The car ferry was the property of the Wabash Railroad, which is a common carrier in the United States, and the boat was registered under the United States law at the port of Detroit. The Grand Trunk Railway, a foreign corporation, is a common carrier by railroad in the Dominion of Canada. It also owns some car ferries running between Windsor and Detroit, and owns lines of railroad coming from the East to Windsor. The Wabash also operates over the Grand Trunk tracks through Canada east from Windsor. These two companies entered into a joint arrangement, controlled by a written contract, by which, in substance, the Wabash car ferries, including the one here involved, were chartered to the Grand Trunk, united in a fleet with its own car ferries, and the whole fleet was then operated by the Grand Trunk in aid of both railroads. The Wabash paid to the Grand Trunk its proper portion of the cost of operating the ferries, but the Grand Trunk employed and paid the officers and crews. As between the crews and the Wabash, the relation of master and servant did not exist, whatever might be the obligations of the railroads as between themselves arising out of the situation and the contract.

The status of the defendant as a carrier by railroad within the United States is perhaps in some confusion. It is to be inferred that its trains reach stations just within the boundaries of the United States at Buffalo and Niagara Falls, but whether over its own tracks or through handling by some local companies does not appear. There are references also to maintenance by the "Grand Trunk" of ferry slips and a dock at Detroit in connection with the Brush street depot (of the D., G. H. & M. R. R.). Two Michigan railroads, the stock of which is controlled by defendant, are commonly included in the trade-name "Grand Trunk Lines West," and whether the Detroit slips and docks belonged

to defendant or to the Lines West does not appear. For the purposes of this opinion we assume that they are defendant's and that, if this ferryboat at the time of the accident had been carrying cars to the Grand Trunk dock at Detroit, the trip would have been incidental to the defendant's status as a common carrier within the United States, and the substantial question now involved would not exist.

There is no doubt that, in the main, defendant is a Canadian railroad, engaged in Canadian transportation. Indeed, we may well take notice that it has been purchased by the Canadian government and is in many respects a governmental instrumentality. Applying the analogy of the familiar principles which caused the first Employers' Liability Act (34 Stat. 232) to be invalid and which required the very definite limitations of the second act, it seems to us clear that such a Canadian railroad is subject to the act only, at the most, in so far as it was at the time and place of the accident engaged in foreign commerce in the United States within the contemplation of the act, and that, if it was not then and there so engaged, it is immaterial that it may, at some other time and place and in relatively trifling amount, be or have been so employed.

The liability here asserted rests upon the relationship of master and servant; that relation was created by the contract of employment; that contract was a Canadian contract, made by a Canadian corporation, with a Canadian resident, and it was to be performed under the supervision of the defendant's corporate officers in Canada, and wholly either in Canada or in international adjacent waters. To impose upon that contract conditions found in a United States statute, and to do so merely because the boat had crossed the invisible and unmarked international boundary only temporarily, would be confusing. Not only would the rules of liability on this boat shift back and forth repeatedly during the day, but it might often be impossible to know on which side of the line the boat was when a liability arose. The rule must apply, not only to railroad ferryboats at different places on the boundary, but to boats up and down the Lakes. Canadian Pacific boats coming down, or New York Central boats (if such there are) going up, may and probably do frequently cross the international line in the narrow channels. If the United States statutory regulation of the employer's liability supersedes the Canadian when they are on this side of the line,

the converse may be true. The general maritime rules, as embodied and applied in the treaty, make the territorial waters of each country absolutely free to the navigation of citizens of the other country. It may be that the power exists to impose United States laws in this respect upon any foreign boat which comes temporarily into our territorial waters; but surely no uncertain inference to that effect should be drawn. The imposition should be in unmistakable terms.[1] Hence, in our judgment, the Employers' Liability Act should not be applied to this situation, unless the Supreme Court has so held.

We do not so interpret the Chisholm Case, 268 U. S. 29, 45 S. Ct. 402, 69 L. Ed. 828, 38 A. L. R. 1048. This held that the act had no extraterritorial effect. When the railroad train, in that case, crossed the border into Canada, it was wholly in a foreign country. It had no right to be there, or to move therein, except by local law; and although the contract of employment was made in the United States, and continued generally in effect during the absence of the parties over the line, yet its merely statutory collateral tort liability could not and did not go along with it. The Canadian laws might or might not apply, depending on their terms, and that was not involved. The controlling principle there adopted cannot, we think, be applicable in a case where, though the national line is crossed, the parties are still generally subject to the laws of their own country, and are subject to the local laws only in a specific and limited way.

On the contrary, the decision in Thompson v. McGregor (C. C. A. 6) 207 F. 209, 215, seems to us to declare the controlling principle. The holding was that Canadian and United States boats on the waters of the Great Lakes continue, although they are on the foreign side of the international line, to be subject to the laws of their own country in all matters of "internal discipline and management," and that the local rules displace the home laws only as to navigation rules and matters of distinctively police power.[2] The Canadian Death Act

[1] As it is with reference to the pay of seamen in Act June 5, 1920, § 31 (46 USCA § 597 [Comp. St. § 8322]).

[2] The jurisdiction of the Detroit United States District Court extends to crimes committed on board of American vessels in the Detroit river, though on the Canadian side of the line. U. S. v. Rodgers, 150 U. S. 249, 260, 266, 14 S. Ct. 109, 37 L. Ed. 1071.

was held not applicable, even though the fatal accident occurred on the Canadian side of the line. Under that holding, it is. plain that the Michigan Death Act would not be applicable here, and for the same reason the Employers' Liability Act cannot be. Though such negligence as we have here is called a tort, yet it was incidental to the internal discipline and management of the boat. The injury happened because Ellis' associates violated the rule of the ship, which required them to give to the engineer a specific notice of Ellis' danger.

It is true that, in the Thompson Case, the registration of the boat was given force, and that, in the present case, the registration was at Detroit. This might often be a controlling consideration; it is the argument of "the flag"; but we think here it is not. The boat was chartered to and operated by the Canadian company.[3] The Employers' Liability Act is not in rem against the instrument of transportation but is in personam against the employer. We think it does not, merely because he is using a boat which is owned and registered in this country, reach the foreign employer who is only on his way here.

The judgment must be reversed and the case remanded for a new trial.

3 The laws of the state where the boat is owned prevail over those of the state of registry (International Co. v. Lindstrom [C. C. A. 2] 123 F. 475); and when the charterer takes a demise of the boat only, and provides his own supplies, officers, and crew, he is so far the owner that his residence fixes the home port (Alaska v. Chamberlain [C. C. A. 9] 116 F. 600, 602).

