### KYRIAKOS v. GOULANDRIS et al.
### No. 340.

Circuit Court of Appeals, Second Circuit.
Aug. 3, 1945.

L. HAND, Circuit Judge, dissenting

See also, D.C., 53 F.Supp. 715.

Reid, Cunningham & Freehill, of New York City (Frederick H. Cunningham, of New York City, of counsel), for respondents-appellants.

Arkin, Lebovici & Kottler, of New York City (Joseph Kottler and Edward Arkin, both of New York City, of counsel), for libelant-appellee.

Before L. HAND, AUGUSTUS N. HAND and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The libellant signed articles in New York City in March, 1941, for a voyage from Newport News to England and back to the United States. He was engaged with several others at the offices of the Greek Line pursuant to orders from the captain of the Theomitor. The Greek Line paid the expenses of his transportation to Newport News, where he joined the ship, and also some of the medical expenses incurred as a result of the assault which gave rise to this action, out of the funds of Hellas. Hellas was the agent for the ship and the respondents Basil, Nicholas and Leonidas Goulandris controlled that firm. The Greek Line was liable as agent for an undisclosed principal.

The general agent and manager of the Greek Line testified that Hellas was the Greek Line's principal for all ships, that he looked to it as such and cleared all money with it. Undoubtedly this was sufficient to establish the liability of Hellas as the general agent controlling the Theomitor for libellant's claims if otherwise well founded. But as to Basil, Nicholas and Leonidas Goulandris, doing business as Goulandris Bros., there was not sufficient evidence to hold them either individually or collectively. If it be conceded that they owned the stock of Hellas or of the Greek Line, this would not render them personally liable. There is no evidence that these corporations were sham or fraudulent. It is true that the captain of the Theomitor listed the ship with the Customs Service at Fernandina as owned by "Goulandris Bros." It appears from his testimony that he probably meant Goulandris Bros. Ltd. London, a corporation not here sued, rather than the copartnership. There was no evidence sufficient to establish liability on the part of the partnership or its individual members.

The claims asserted by the libellant arose out of injuries resulting from an assault of the libellant by one George Bouritis. The latter was hired in New York by the Greek Line, made the trip to Newport News, and joined the ship at the same time as the libellant. Before the ship sailed, libellant and others saw Bouritis smoking what he said was hasheesh; while he smoked he sang, danced and said: "Any one will talk to me I will kill him. Now I am the king." About six hours after the ship left Newport News, Bouritis struck a coal passer on the head with a pail. When asked for an explanation, he repeated: "Anyone will talk to me I will kill him." The coal passer was taken to the captain for first aid, and told the captain that Bouritis had struck him for no cause. The boatswain then told the captain that Bouritis was a "bad character" and smoked hasheesh. Bouritis continued to be quarrelsome; he attempted to strike another fireman, one Haralambides, after an altercation over the manner in which Haralambides did his work, but was prevented by the boatswain. After this incident Haralambides complained to the second engineer "that he couldn't work alongside a man who was scrapping all the time". Bouritis next threatened Almorantis, a fireman, when coal fell out of the boiler, saying: "Be careful you don't burn somebody, and if you are not careful I will burn you." When Almorantis answered that he was as careful as he could be, Bouritis slapped his face. Almorantis complained to the first engineer, the proper officer to receive complaints, telling him what had happened. He also told him that "every time he came on watch" Bouritis smoked hasheesh and was "out of his mind." After the ship arrived at Fernandina, several of the crew, including the libellant and the boatswain, went to the captain and asked him, according to libellant's testimony: "What are you going to do with this fellow, George Bouritis, who makes trouble all the time and who smokes hash-

eesh, and who has hit the consul at Antwerp?" The captain replied: "Leave now and I will see what I am going to do."

A few days after the arrival at Fernandina, Bouritis brought a colored woman to his bunk aboard ship. When one of the crew remonstrated with him, Bouritis said: "What business is it of yours?" When Almorantis also remonstrated, Bouritis said: "I don't have to ask you, you pimp" and began striking and slapping him. Although members of the crew tried to separate them, and Almorantis tried to escape, Bouritis brought him down to the floor, bit him in the back of the neck and continued to hit him. The libellant was watchman on that night. He and another watchman heard someone crying: "Help me, he is killing me." They ran forward, and saw "Almorantis on the floor with Bouritis' teeth in the back of Almorantis' neck, and punching him in the face." A lamp had fallen over and started a fire. While libellant put out the fire the other watchman separated Almorantis and Bouritis.

There were no officers aboard, but the libellant had orders from the captain not to allow anyone on board the ship without a pass. He therefore took the colored woman ashore, despite Bouritis' threat: "Don't take that woman off the boat, I will kill you." Bouritis also then left the ship, saying to libellant: "I will make you pay for this."

When the captain was informed of the incident, he sent for Bouritis and said to him, with a wink: "Did they take your Missus off the boat?" He apparently did nothing at any time prior to the subsequent assault upon the libellant to check Bouritis' vicious tendencies, of which he appears to have had very adequate information, or to terminate Bouritis' employment with the ship.

The next evening libellant went ashore to buy some soap and other merchandise he would need for the voyage. After making his purchases he met a number of other members of the crew who hailed him from a Greek coffee house as he passed. He said to them that he had been told by the chief engineer to hurry back, but he was prevailed upon to drink one cup of coffee before all of them went back to the ship together. Thereafter they went out of the coffee house and set out for the ship. Three or four blocks from the coffee house Bouritis was hidden behind the corner of a building; as they turned the corner he sprang upon the libellant with a knife and stabbed him repeatedly in the body, inflicting extensive wounds in the loin and groin on the right side and the axilla and heart region on the left, as well as other less serious wounds. The attack took place 150 to 200 meters from the ship, according to the testimony of Almorantis and the libellant, and about a mile, or ten minutes walk from the ship according to the testimony of the captain.

It is evident that Bouritis had shown himself prior to the attack upon the libellant to be of such savage and uncontrolled disposition, and so easily provoked, as to be a danger to men who worked on the same ship with him. This had become apparent even before the incident of the colored woman which provoked Bouritis to ambush the libellant. There was evidence that the captain of the Theomitor was fully informed that Bouritis was a quarrelsome troublemaker, that he smoked hasheesh, and that he had assaulted more than one man at least once with little or no reason. Several members of the crew had complained of him and a delegation had called upon the captain at Fernandina to ask what he intended to do with the troublemaker. He did nothing.

■ If Bouritis had been discharged during the first three days of the ship's stay at Fernandina, the incident giving rise to the assault would never have occurred. Seamen have no legal power to rid themselves of dangerous shipmates. That power rests with the officers of the vessel. If the officers choose to continue to employ a man who is known or should be known by them to be a source of peril to those who sail with him, when measures which might reasonably be expected to prevent resulting injury are not or cannot be taken, a resulting injury to a member of the crew is one for which the person injured may recover under the Jones Act, 46 U.S.C.A. § 688. Koehler v. Presque-Isle Transportation Co., 2 Cir., 141 F.2d 490.

The master denied all knowledge of the vicious disposition of Bouritis and of the incident of the expulsion of the woman from the ship, but the judge found in spite of this "that the master knew or that he at least should have known * * * that Bouritis was a man of a vicious and violent character and irrational."

■■ Appellants contend, however, that the libellant cannot sue under the Jones Act because it gives no remedy to an alien employed on a foreign ship. Both Hellas and

the Greek Line are foreign corporations and so apparently was Goulandris Ltd. of London. The Goulandrises were Greeks resident abroad; so was Polemis, the registered owner of the Theomitor, who was not served. We cannot find anything in the record to support the statement of the District Court that libellant was a resident of the United States. He was a Greek citizen. He had come to this country as a seaman, for he testified that he "stopped from work" on the vessel which brought him to this country because that ship required repairs. He had been here for an unspecified period, which was certainly less than three months, when he signed on the Theomitor. His stay in this country since his injuries were sustained is not sufficient, under all the circumstances, to show that he had acquired a residence in the United States when he signed on which would give him a right of action under the Jones Act. Gambera v. Bergoty, 2 Cir., 132 F.2d 414, certiorari denied 319 U.S. 742, 63 S.Ct. 1030, 87 L.Ed. 1699. We are thus called upon to determine whether an alien seaman who signed on in an American port for a voyage beginning and ending in American waters can sue under the Jones Act. Although the matter is doubtful we believe that he can.

In Plamals v. The Pinar Del Rio, 277 U. S. 151, 48 S.Ct. 457, 72 L.Ed. 827, where the only question decided was that there was no maritime lien given by the Jones Act which entitled a Spanish seaman who was injured while on a British ship at the port of Philadelphia to bring a suit in rem against the vessel, the court said that it was unnecessary to consider whether the provisions of Section 33 of the Jones Act were applicable. That was obvious, for recovery was sought in rem and not in personam.

The Jones Act, 46 U.S.C.A. § 688, is not in terms restricted to American seamen, but gives a right of action to "any seaman who shall suffer personal injury in the course of his employment." It is, however, contended that "seaman" means an American seaman or a seaman of an American vessel. In support of this contention it may be argued that the title of the Seamen's Act of 1915, 38 Stat. 1164, to which the Jones Act was an amendment, reads in part: "An Act to promote the welfare of American seamen in the merchant marine of the United States."

In Strathearn S. S. Co. v. Dillon, 252 U.S. 348, 354, 40 S.Ct. 350, 351, 64 L.Ed. 607, the Supreme Court in construing Section 4 of the Seamen's Act of 1915 said: "But the title of an act cannot limit the plain meaning of its text, although it may be looked to to aid in construction in cases of doubt." In that case a foreign seaman who had signed articles in a foreign country, on a foreign ship, sued to recover one-half the wages due him at the port of Pensacola. Section 4 of the Seamen's Act, 46 U.S.C.A. § 597, gave "seamen on foreign vessels" the right to bring such an action. Although Section 4 did not expressly extend to "foreign seamen", and it was argued that the title of the act limited the right of suit to American seamen serving on foreign ships, the court held that the foreign seamen were entitled to sue under Section 4.

The effective scope of the Jones Act is not confined to the purpose of the Seamen's Act as indicated by the title. If it were so limited, seamen on foreign vessels would have no right to sue under the act, since the language of the title speaks of "American seamen in the merchant marine of the United States". But the Supreme Court held in Uravic v. F. Jarka Co., 282 U.S. 234, 51 S.Ct. 111, 75 L.Ed. 312, that an American stevedore working on a foreign ship in an American port was entitled to sue under the act. Furthermore, the act itself indicates that its scope is broader than its purpose as expressed in the title, for Section 4 of the Seamen's Act of 1915 provides that the statutory right of seamen to demand half the wages due them "shall apply to seamen on foreign vessels while in harbors of the United States * * *" as well as to seamen on vessels of the United States. Nor does this passage indicate any Congressional intention to extend this right and no other conferred by the statute to foreign seamen on foreign vessels, since the right to half wages as originally created by statute was expressly limited to seamen on American vessels. The Seamen's Act of 1915 therefore required explicit amendatory language to extend this right to seamen on foreign ships, but the right of suit given by the Jones Act was not originally so limited, was literally in perfectly general terms, and accordingly did not require express extension.

When Congress used the word "seamen" in the Jones Act it employed a word of general application, embracing men of any nation who sail the seas. Had it wished to limit the application of the statute to seamen of American citizenship or residence, the words to effectuate the limitation were

at hand. The legislators did not see fit to use them. With the adjective "American" applied to seamen in the title of the very act of which the Jones Act was an amendment, we cannot suppose that its omission from the statute itself was merely an oversight. Instead, it appears evident that Congress deliberately chose to leave the word "seaman" its full and unrestricted meaning applicable to aliens and Americans alike unless in cases like The Paula, 2 Cir., 91 F.2d 1001, which we think may be distinguished in the way hereafter to be mentioned.

Congress has undoubted authority to make a statute of this sort applicable to foreign vessels in our ports. Patterson v. The Eudora, 190 U.S. 169, 23 S.Ct. 821, 47 L.Ed. 1002; see also Strathearn S. S. Co. v. Dillon, supra, at page 356, 40 S.Ct. at page 352, 64 L.Ed. 607.

In Gambera v. Bergoty, 2 Cir., 132 F.2d 414, certiorari denied 319 U.S. 742, 63 S.Ct. 1030, 87 L.Ed. 1699, this court upheld the right of an alien seaman on a foreign ship to sue under the Jones Act where the alien had long been a resident of the United States. The Fifth Circuit in Arthur v. Compagnie Generale Transatlantique, 5 Cir., 72 F.2d 662, agreed that nationality was unimportant, holding that a stevedore of unproven citizenship injured aboard a foreign vessel in the Canal Zone was entitled to sue under the Jones Act; presumably the stevedore was a resident of the Canal Zone, although that factor does not seem to have entered into the consideration of the court in that case. In The Paula, 2 Cir., 91 F.2d 1001, 1004, we declined to extend the right to sue to a German seaman who signed on in Chili for a voyage aboard a Danish ship to Brooklyn, New York. The fact that the seaman was injured on the voyage, while at the intermediate port of Jacksonville, Fla., was held insufficient in and of itself to confer any right to sue under the Jones Act. We think the decision in The Paula is not determinative of the case at bar for there Judge Swan concluded the opinion by saying: "We think the intention to legislate for alien seamen who have signed articles abroad on a foreign ship ought to be clearly expressed before the courts extend the statute to them."

In the instant case the libellant signed on in an American port, and he was injured in an American port. We think this is sufficient both on reason and on authority. The intention of Congress to benefit American seamen would not be served by a contrary construction of the statute, since it would tend to encourage the hiring of foreign seamen in American ports in preference to American seamen because the aliens would not have the right of suit against their employers if injury should occur in those ports, while American seamen would. A similar line of reasoning has been set forth by the Supreme Court in Strathearn S. S. Co. v. Dillon, supra, 252 U.S. at pages 354, 355, 40 S.Ct. at pages 351, 352, 64 L.Ed. 607, in connection with another section of the statute.

In Patterson v. The Eudora, supra, six seamen, "one or more of whom were American citizens", signed on in New York aboard a British vessel for a voyage from Portland, Maine, to Rio, "final port of discharge to be in the United States of America or Canada." 110 F. 430. At time of shipment twenty dollars was paid on account to each of them. The seamen sued under a statute of 1898, 46 U.S.C.A § 599, making it unlawful to pay advance wages to "any seaman," and providing that such advance payment should be no defense to an action for the payment of full wages. The statute was expressly made applicable to foreign vessels, but no express language extended the scope of the word "seaman." The Supreme Court, in holding the statute applicable to foreign vessels, said at page 172 of 190 U.S., at page 822 of 23 S.Ct., 47 L.Ed. 1002: "It is true that the title of the act of 1898 is 'An Act to Amend the Laws Relating to American Seamen,' but it has been held that the title is no part of a statute, and cannot be used to set at naught its obvious meaning." And at page 179 of 190 U.S., at page 824 of 23 S.Ct., 47 L.Ed. 1002, in the last sentence of the opinion: "We are of the opinion that it is within the power of Congress to protect all sailors shipping in our ports on vessels engaged in foreign or interstate commerce, whether they belong to citizens of this country or of a foreign nation * * *."

To be sure the court there had to determine whether any seaman on a foreign vessel was within the statute, but we think the statements applicable here. The last sentence quoted is the considered statement by the Supreme Court of the applicable rule. By it, the class protected by Congress is defined as "all sailors shipping in our ports." No distinction is made between foreign and American sailors, or foreign and American ships. This definition was formulated in connection with a statute having a title as restrictive as that of the one we are con-

struing, and involving precisely the same word—"seaman." This is, we think, a persuasive authority. It is true that "one or more" of the seamen in that case were American citizens but it does not appear that all of them were. The Supreme Court made no distinction between them. If it had been necessary for any of the seamen to show that they were citizens in order to maintain the action, they would have failed to do so. The only conclusion to be drawn is that the court did not consider it necessary. Our interpretation of the Supreme Court's meaning is confirmed by the statement of the Circuit Court of Appeals for the Ninth Circuit in Kenney v. Blake, 125 F. 672, 674, where Morrow, J., said of The Eudora case: "It was there held that the act of December 21, 1898, was applicable to seamen shipping in a port of the United States on a foreign vessel, and that the statute was valid."

■ It is true that in the absence of any statute, liability for a tort committed on board a vessel while the vessel is in the territorial waters of a state is determined, if it affects only the internal economy or discipline of the vessel, by the law of the state whose flag the vessel flies. American Law Institute Conflict of Laws § 405. But in the instant case the sweeping terms of the statute, the decisions which have already extended the remedial provisions for payment of half wages to foreign seamen on foreign vessels when in American ports and have allowed recovery of advanced wages for seamen shipping in American ports, and our own decision in Gambera v. Bergoty, 132 F.2d 414, certiorari denied 319 U.S. 742, 63 S.Ct. 1030, 87 L.Ed. 1699, indicate a tendency to give the statutes in aid of seamen a liberal interpretation which would seem to cover the rights of the libellant in the present case. It would not invade the internal economy of foreign vessels further than has already been done and would pro tanto lessen a competitive advantage to foreign shipowners in hiring aliens rather than Americans for their crews.

■ The libellant was injured in the course of his employment. He was a watchman charged to keep unauthorized persons from boarding the ship on the night that Bouritis brought the colored woman aboard. It was the libellant's expulsion of this woman, while in discharge of his duty, that gave rise to the assault. If Bouritis had drawn his knife and attacked the libellant when and where the expulsion took place, there could have been no doubt that libellant would have been injured in the discharge of his duties. We think that it made no difference that Bouritis waited until he could ambush the libellant ashore. Neither the short lapse of time, nor the distance from the ship's side, was relevant. So long as the resulting assault was not too causally remote—and here it clearly was not—the libellant was injured in the course of his employment when the assault was the consequence of action taken in discharge of his duty. We think that the reasoning in O'Donnell v. Great Lakes Co., 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596, and Marceau v. Great Lakes Transit Corp., 2 Cir., 146 F.2d 416, certiorari denied 324 U.S. 872, 65 S.Ct. 1018, supports this result and that it made no difference that libellant was at the time on shore. As was said by Stone, C. J., in the first of these two decisions, 318 U.S. at page 42, 63 S.Ct. at page 492, 87 L.Ed. 596:

"The right of recovery in the Jones Act is given to the seaman as such, and, as in the case of maintenance and cure, the admiralty jurisdiction over the suit depends not on the place where the injury is inflicted but on the nature of the service and its relationship to the operation of the vessel plying in navigable waters."

The same reasoning applies to the cause of action for maintenance and cure. There can be no distinction, for the purposes of determining this claim, between an injury suffered "in the service of the ship" and one suffered "in the course of his employment." Where injury results from duties performed in the service of the ship, the fact that a libellant is not actually performing a duty for the ship at the time when injury occurs is immaterial.

■ But we do not rest our decision on this point on this ground alone. The Supreme Court has said, Aguilar v. Standard Oil Co., 318 U.S. 724, 737, 63 S.Ct. 930, 937, 87 L.Ed. 1107, that the liability of a shipowner for maintenance and cure extends to "injuries incurred on the dock or other premises which must be traversed in going from the vessel to the public streets or returning to it from them," but added: "How far it extends beyond that point we need not now determine." But the reasoning and intimations of the opinion indicate a liability for maintenance and cure in the case of injuries received while the seaman is on shore leave, that are not due to any misconduct on his part. We think it follows that the award to the libellant for maintenance,

cure and wages to the end of the voyage was proper.

As to the appellants Basil Goulandris, Nicholas Goulandris and Leonidas Goulandris, individually and as co-partners doing business under the firm name and style of Goulandris Bros., the judgment of the District Court is reversed. As to the appellants Goulandris Bros. (Hellas) Ltd. and General Steam Navigation Co., Ltd. of Greece, the judgment is affirmed.

L. HAND, Circuit Judge (dissenting).

There is much temptation to affirm this decree; yet I cannot see how we can do so without recognizing an exception to a well-settled principle—a principle moreover which it seems to me desirable to preserve intact. As my brothers agree, it is generally accepted law that in all matters relating to "the internal economy or discipline" of a ship "the law of the flag" controls. I have gathered in the margin * a number of decisions which invoke this principle in varying applications; nobody disputes it; and it seems to me most undesirable, except for some pressing reason of domestic policy, to disregard it. It is a hardship to owners, and it may be to seamen, to have their legal relations depend upon the accident of the port of call at which the ship puts in; it is impossible to adjust affairs to constantly shifting standards, some of which will favor one party, some, another. Moreover—and this, I think, we should treat most seriously—it must often be irritating to the state of the flag for the state of a port of call to insist that its own notions of what is just between owner and crew shall supersede those satisfactory to the first state. There are occasions, of course, when the state of the port has an overriding interest in insisting upon its own ideas; but in the case at bar the question does not touch a breach of our peace, or, as I shall try to show, an object in which it can be supposed that we have any interest. If so, I submit that we should demand the clearest warrant before we substitute the Jones Act—primarily at any rate a local statute—for the pertinent law of Greece.

As I have just said, I can discover no reason of policy or of authority for displacing that law. My brothers believe that not to impose upon a foreign owner the same liability towards foreign seamen that he is under towards American seamen, may result in favoring the employment of the first, and in handicapping that of the second. I could see force in that, if we could impose the same liability upon foreign owners, regardless of where the injury occurred. If that were true, a plausible argument could be made that it would handicap the employment of American seamen, to exempt the owner from liability to foreign seamen who suffered injuries on his ship. Even so, I have some doubt how far this would really count, but I shall assume provisionally that it would be of enough importance to be a factor in the mind of Congress. The decision we are now making will not end this handicap, if it exists. We cannot fix the liabilities of foreign owners to foreign seamen for injuries occurring at sea, or in other ports than our own; at least, nobody suggests that the Jones Act does so. All we shall accomplish is to hold that, whenever a foreign seaman happens to be injured in one of our ports, he may recover whenever an American seaman might recover. Considering how small a proportion of the injuries which occur on ship-board are likely to happen in our own ports, I cannot help feeling that as a corrective of any putative handicap to the employment of Americans, this is much too tenuous to count.

Further, unless we are to overrule The Paula, 2 Cir., 91 F.2d 1001, liability in these circumstances will hereafter depend upon whether the foreign seaman signs on in a United States port or abroad: certainly that should not be critical. Of course it would be critical, if the ordinary doctrine of conflict of laws obtained, but we have the most categorical declaration in The Belgenland, supra, that in all that relates to a maritime contract the law of the flag prevails. If the decision now to be made is to stand, we should frankly overrule The Paula, so capricious will be the result if we

* The Scotland, 105 U.S. 24, 26 L.Ed. 1001; The Belgenland, 114 U.S. 355, 5 S.Ct. 860, 29 L.Ed. 152; United States v. Rodgers, 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071; Cunard S. S. Co. v. Mellon, 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894, 27 A.L.R. 1306; Thompson Towing & Wrecking Association v. Mc-Gregor, 6 Cir., 207 F. 209, 217–219; Rainey v. New York & P. S. S. Co., 9 Cir., 216 F. 449, 454, L.R.A.1916A, 1149; The Hanna Nielsen, 2 Cir., 273 F. 171; Grand Trunk R. Co. v. Wright, 6 Cir., 21 F.2d 814; Cain v. Alpha S. S. Corp., 2 Cir., 35 F.2d 717.

do not. And if we do overrule it, I should think, as I have already suggested, that it might perceptibly nettle those maritime powers whose ships frequent our shores, and which may, with warrant, believe that we should not attempt to take from them the power to adjust, contrary to their desires, legal relations with which we have no concern.

My brothers' main reliance appears to be Patterson v. The Eudora, 190 U.S. 169, 23 S.Ct. 821, 47 L.Ed. 1002, and Strathearn S. S. Co. v. Dillon, 252 U.S. 348, 40 S.Ct. 350. 64 L.Ed. 607. The second can at once be ruled out. When Congress added to the proviso that "the courts of the United States shall be open to such seamen for its enforcement," I do not see how the court could escape concluding that foreign seamen were intended. As applied to that statute, unlike the one at bar, there was a good reason for this. It might create a substantial preference for foreign seamen as against American seamen, if the statute did not apply to both, for it would then result that an American who saw a better berth in a United States port might desert with the loss of only half his wages, while a foreigner must lose all. Considering the proclivity of all seamen to leave the ship at a port where a better chance offers, this added inducement to desertion might be a consideration of genuine importance. As to Patterson v. The Eudora, supra, I agree that it is practically certain that some of the libellants were foreigners. However, the point was not discussed—indeed it was not even alluded to—and it does not seem to me that we should treat it as a decision. All the court was really concerned about was whether Congress could constitutionally make the act against crimping seamen apply to foreign ships. Besides, considering the fact that the prepayments condemned would be made ashore in our ports, that was a wrong actually taking place within our borders, a circumstance which might well have been thought to prevail over the fact that it also affected the relations of foreign owners to foreign seamen. Finally, I do not read the opinion in that case as holding that the title of the act is never in any way relevant to its interpretation; on the contrary, all the court meant was that in that particular case the plain language of the act itself forbade the title to be taken as controlling.

In closing it is perhaps well to notice that, although the assault took place ashore, the only question is whether Bouritis's undoubted liability is to be imputed to the ship's owner. Certainly that falls within the "internal economy or discipline" of the ship: so far, I understand that we are all at one.