**Appellate Department, Superior Court, San Francisco**

[Civ. A. No. 1826.   Feb. 20, 1948.]

ISAAC PETERSEN, Respondent, v. MARINE TRANSPORT
LINES, INC. (a Corporation), Appellant.

Lillick, Geary, Olson, Adams & Charles for Appellant.

Gladstein, Andersen, Resner & Sawyer for Respondent.

MURPHY, J.—The pertinent facts upon this appeal are as follows: The respondent joined the S. S. "Clifford D. Mallory" at the port of Batangas, Philippine Islands, as a fireman-water tender. At that time the vessel was anchored awaiting the discharge of its cargo. The ship remained in port during the entire period of the respondent's service.

One afternoon, April 12, 1946, the respondent, with permission, went ashore. He obtained a ride on an Army truck and proceeded to travel in the outlying district of the port. The record fails to reveal with any degree of accuracy how far the plaintiff went from the ship. However, the respondent finally left the truck sometime later at an Army camp. There is no evidence of any misconduct on the part of the plaintiff.

The afternoon or evening of the same day the respondent was set upon by assailants unknown to him, sustaining injuries which are the subject matter of this litigation. He returned to the ship and worked thereon for six days before he was sent to a hospital by the captain of the vessel.

We are called upon to determine whether a seaman, injured under such circumstances, may be properly compensated for wages and bonus covering the period of time following the shoreride injuries sustained by him.

It is urged by the defendant and appellant that there is no evidence to support a finding that plaintiff and respondent was acting in the service of his ship, or pursuant to some duty attached to his job of fireman-water tender at the time of his injury or at any time immediately preceding it.

It is argued further that plaintiff and respondent sustained the injury while upon "a frolic of his own."

If this were a case of first impression it would appear that such arguments of appellant are patently sound.

But we are confronted with a philosophy of law which has found its way into the decisions of our United States Supreme Court. This philosophy of law finds its most articulate expression in the case of *Aguilar* v. *Standard Oil*, 318 U.S. 724 [63 S.Ct. 930, 935, 87 L.Ed. 1107].

The decision therein was broad in its scope and was founded, among other things, upon considerations peculiarly applicable to seamen. Thus it was held in the court's opinion that:

"To relieve the shipowner of his obligation in the case of injuries incurred on shore leave would cast upon the seamen hazards encountered only by reason of the voyage. The assumption is hardly sound that the normal uses and purposes of shore leave are exclusively personal and have no relation to the vessel's business. Men cannot live for long cooped up aboard ship without substantial impairment of their efficiency, if not also serious danger to discipline. Relaxation beyond the confines of the ship is necessary if the work is to go on, more so that it may move smoothly. No master would take a crew to sea if he could not grant shore leave, and no crew would be taken if it could never obtain it. Even more for the seamen than for the landsman, therefore, the superfluous is the necessary . . . to make life livable and to get work done. In short, shore leave is an elemental necessity in the sailing of ships, a part of the business as old as the art, not merely a personal diversion.

"The voyage creates not only the need for relaxation ashore, but the necessity that it be satisfied in distant and unfamiliar ports. If in those surroundings a seaman, without disqualifying misconduct, contracts disease or incurs injuries, it is because of the voyage, the shipowner's business. That business has separated him from his usual places of association. By adding this separation to the restrictions of living as well as working aboard, it forges dual and unique compulsions for

seeking relief wherever it may be found. In some, it is the ship's business which subjects the seaman to the risks attending hours of relaxation in strange surroundings. Accordingly, it is but reasonable that the business extend the same protections against injury from them as it gives for other risks of the employment.''

From the foregoing language we glean the philosophy underlying the law as it stands today in cases of this character.

This philosophy is further expressed in *Socony-Vacuum Oil Co.* v. *Smith,* 305 U.S. 424, 431 [59 S.Ct. 262, 266, 83 L.Ed. 265], wherein Chief Justice Stone expressed his views as follows:

''Seamen are the wards of the admiralty, whose traditional policy it has been to avoid, within reasonable limits, the application of rules of the common law which would affect them harshly because of the special circumstances attending their calling. . . . It is for this reason that remedial legislation for the benefit and protection of seamen has been liberally construed to attain that end.''

In its memorandum of Points and Authorities the appellant relies upon *Meyer* v. *Dollar S. S. Lines,* 49 F.2d 1002. This case was reviewed by the Supreme Court and its philosophy was expressly rejected by the Supreme Court in the Aguilar case. *Jackson* v. *Pittsburgh S. S. Co.,* 131 F.2d 668 and decided in 1942, is also relied upon by the appellants. An examination of it reveals that the plaintiff seaman, while a member of the crew of a steamship, desired to go ashore after going off watch. Proceeding to the forward part of the main deck to descend the ladder to the dock, he found none available and requested a fellow member of the crew to place a ladder over the side of the vessel so that he might go ashore. His request was refused and the plaintiff jumped from the vessel to the dock, a distance of about 6 feet, sustaining painful and serious injuries.

The court, in affirming an order dismissing the complaint, held that assuming a breach of duty on the part of the owners in their failure to provide a ladder, nevertheless such negligence bore no causal relation to the injuries of the plaintiff which followed.

In other words, in this case the court held that in order to recover, an injured seaman must have acted without gross negligence or misconduct, and his own wilful wrongdoing give him no right against the vessel or her owners.

The seaman was not compelled to jump. The only injury that he might have anticipated in the circumstances would have been inconvenience or delay in leaving the vessel. He acted upon his own volition in jumping, and by so doing brought about an intervening cause for which his own wilful misconduct is responsible.

*Collins* v. *Dollar S. S. Lines, Inc., Ltd.*, 23 F.Supp. 395, 397, decided in 1938, is also relied upon by the appellants.

Certain crew members of the vessel involved, engaged in a game of baseball for recreation and Collins sustained serious and permanent injuries. The game occurred ashore. Again the question was: Whether the injuries were sustained "in the service of the ship?"

Citing *Meyer* v. *Dollar S. S. Lines, Inc., Ltd.*, 49 F.2d 1002, 1004, wherein it is stated that:

"An injury suffered or a disease contracted by a sailor is considered to have been 'in the line of duty' *unless* it is actually caused by something for which he is responsible which intervenes between his service or performance of duty and the injury or disease. He will be responsible for an intervening cause if (1) it consists of his own wilful misconduct, or (2) it is something which he is doing in pursuance of some private avocation or business, or (3) it is something which grows out of relations unconnected with the service or is not the logical incident or (of) (sic) provable effect of duty in the service."

Obviously the injuries sustained in the baseball game constituted an intervening cause. The injury grew out of that which the seaman was doing deliberately and in pursuance of a private avocation born out of his own volition.

Certainly this case is not analogous to the case before us. Petersen was not playing baseball, nor did he jump from the deck of his ship. He was guilty of no misconduct or negligence nor can his shore leave conduct in any way be construed as setting in motion any intervening cause which, as in the Jackson case and the Collins case, would prevent recovery.

*Kyriakos* v. *Goulandras et al.*, 151 F.2d 132, 138, decided in 1945.

George Kyriakos, a Greek citizen, and fireman aboard the S. S. Theomitor, libeled against Goulandris Bros., Limited, for injuries sustained as a result of an assault by a fellow seaman, asserting causes of action for cure, maintenance and

wages to the end of the voyage and under the Jones Act, [38 Stats. 1185] 46 U.S.C.A. § 688. Leaving a coffee shop ashore, in Fernandina, Florida, and setting out for the ship, libellant was set upon by his fellow seaman who stabbed him repeatedly in the body inflicting extensive wounds. The attack occurred about a mile from the ship. Much of the opinion is devoted to matters not pertinent to the situation which confronts us.

In its decision the court took occasion to consider the Aguilar case and to observe that:

"The reasoning and intimations of the opinion indicate a liability for maintenance and cure in the case of injuries received while the seaman is on shore leave that are not due to any misconduct on his part."

*Nowery* v. *Smith*, 69 F.Supp. 755, decided in 1946.

In this case, the plaintiff, a former seaman, sued for personal injuries under the Jones Act and for maintenance and cure. The injuries complained of were suffered in a fist fight with the chief engineer of the vessel involved. The altercation took place in a saloon at Antilla, Cuba. A jury found for the plaintiff. A motion notwithstanding the verdict was denied. The court rejected the first theory of liability urged by the plaintiff, namely, that the chief engineer was acting "as an officer of the ship" when he entered the bar-room, but accepted the second theory which was that the engineer was a person of cruel, brutal and inhuman nature, one known to give vent to a wicked disposition by violent and uncalled for assaults upon others, and that his disposition was known or should have been known to the master of the vessel. It has been held that tolerance of such an individual among the crew constitutes negligence on the part of the vessel's owners.

The court also took occasion to observe that logic compels the conclusion that the seaman should also be considered on the shipowner's business while he is actually enjoying his shore leave, citing *Moss* v. *Alaska Packers' Assn.*, 70 Cal.App. 2d Supp. 857 [160 P.2d 224].

The case of *Meyer* v. *Dollar S. S. Lines, supra* [49 F.2d 1002, 1003], is also relied upon by appellant. Therein the libellant engaged in a friendly scuffle aboard ship with a shipmate the day before the vessel's arrival in Honolulu. His leg was injured. At the time libellant was off watch and had not been drinking. Had the libellant been sitting quietly on the deck, and had something fallen upon his leg through circumstances entirely beyond his control, the injury might have

been held as incurred in "the service of the ship." But the facts are quite different. Hence, the court properly applied the rule of intervening cause for which the appellant alone was responsible. Thus the court distinguishes between the act of the seaman in engaging in the scuffle and the seaman who might be injured through an agency not placed in operation by himself. When he began the good natured scuffling the seaman created, by his own volition, an extraneous circumstance; he brought about an intervening cause that directly affected his relation to his employers and to the ship.

The peculiar character of a sailor's occupation necessarily calls for a liberal interpretation of the phrase "in the service of the ship."

Unlike other workmen, a sailor cannot shed his responsibilities to his vessel when his day's work is done. It is for that reason that courts, called upon to determine what constitutes "in the service of the ship" have given it a wide range.

"Courts of admiralty have always considered seamen as peculiarly entitled to their protection." (*The A. Heaton,* 43 F. 592, 595.)

Similarly it has been held that a seaman who "falls sick" or is wounded, in the service of the ship, if such misfortune attacks him while he is attached to the ship as part of her crew, it is enough that he was, when incapacitated, subject to the call of duty as a seaman and earning wages as such. (*The Bouker No. 2,* 241 F.831 [154 C.C.A. 533].)

*Aguilar* v. *Standard Oil Co. of New Jersey,* 318 U.S. 724 [63 S.Ct. 930, 87 L.Ed. 1107].

In this case, plaintiff, a mess-man, left his ship on shore leave at about six p. m. As he proceeded through the pier toward the street all lights were extinguished. In the darkness he fell into an open ditch at a railroad siding and was injured to the extent that he was prevented from resuming his normal duties. He sued for maintenance and cure and wages. The District Court dismissed the complaint, and on appeal, the Circuit Court of Appeals affirmed. Both courts held that in going ashore on personal business the plaintiff left the service of the ship and therefore no liability for maintenance and cure attached.

Admittedly a shipowner is liable if the injury occurs while the seaman is "in the service of the ship."

Plaintiff contended "in the service of the ship" includes the whole period of service covered by the Seamen's Articles;

and if he is injured during this time his right to recovery exists unless it is shown by way of defense that he has forfeited the right by his own misconduct causing the injury. Plaintiff urged that since the injuries were received during the period of his service there being no misconduct, the claims are established.

The shipowners took a more narrow view of the phrase. Their position is that if ashore, the seaman must be injured while he is ''on duty'' or at work doing some task connected with the vessel's business. They argued that ''to go ashore'' simply for diversion and relief from discipline, or for any matter personal to the seaman, takes him out of the service of the ship. In this view it is of no moment whether the injury results from the seaman's fault or from causes entirely beyond his control.

''From the earliest times maritime nations have recognized that unique hazards, emphasized by unusual tenure and control, attend the work of seamen. The physical risks created by natural elements and the limitations of human adaptability to work at sea, enlarge the narrower and more strictly occupational hazards of sailing and operating vessels. And the restrictions which accompany living aboard ship for long periods at a time combine with the constant shuttling between unfamiliar ports to deprive the seamen of the comforts and opportunities for leisure, essential for living and working, that accompany most land occupations. Furthermore, the seaman's unusual subjection to authority adds the weight of what would be involuntary servitude, for others, to these extraordinary hazards and limitations of ship life.

''Accordingly, with the combined object of encouraging marine commerce and assuring the well-being of seamen, maritime nations uniformly have imposed broad responsibilities for their health and safety upon the owners of ships.''

In this country these notions were reflected early and have since been expanded in legislation, designed to secure the comfort or health of seamen aboard ships, hospitalization at home and care aboard.

The statutes are uniform in evincing solicitude that seamen shall have at hand the barest essentials for existence. They do this in two ways. One is by recognizing the shipowners' duty to supply them, the other by providing for care at public expense. The former do not create the duty. That existed long before the statutes were adopted. They merely

recognize the preexisting obligation and put specific legal sanctions, generally criminal, behind it.

The provisions for public assistance were not intended to relieve the shipowner of his duty. On the contrary, their purpose was to make sure the seaman would have care if the employer failed to give it and in the rarer cases to which his obligation does not extend. The legislation, therefore, gives no ground for making inferences adverse to the seaman or restrictive of his rights. See *Reed* v. *Canfield*, Sumn. 195, 20 Fed.Cas. 426, 427 No. 11641.

Rather it furnishes the strongest basis for regarding them broadly, when an issue concerning their scope arises and particularly when it relates to the general character of relief the legislation was intended to secure.

The obligation imposed upon the shipowner for maintenance and care of seamen, ill or injured during the period of their service, has been consistently recognized in the United States as an implied provision in contracts of marine employment.

This obligation, or liability, is in no sense predicated on the fault or negligence of the employer. Whether by traditional standards he is or is not responsible for the injury or sickness, he is liable for the expense of curing it as an incident of the marine employer-employee relationship. (*The City of Alexandria,* 17 F. 390.)

So broad is the shipowner's obligation that negligence or acts short of probable misconduct on the seaman's part will not relieve him of the responsibility. See *Petersen* v. *The Chandos,* 4 F. 645.

Considerations of contributory negligence, the fellow servant rule, and assumption of risk, do not enter into the picture at all. Only wilful misbehavior or a deliberate indiscreet act suffices to deprive the seaman of protection. Classic examples of such instances are venereal disease and injuries received as a result of intoxication. *It is noteworthy to observe that upon occasion even the latter have been qualified in recognition of the predisposition of sailors ashore.* (*The Quaker City,* 1 F.Supp. 840.)

The employer's responsibility for maintenance and cure extends beyond injuries sustained because of, or while engaged in activities required by his employment.

For the reasons stated herein it is my considered opinion that we should not depart from the conclusions we

reached in *Moss* v. *Alaska Packers' Assn., supra,* and that the judgment appealed from be affirmed.

Kaufman, J., concurred.

GRIFFIN, P. J.—I dissent. The evidence in the instant case conclusively shows that at the time of the injury complained of and for which he asks damages, plaintiff and respondent was not, and by no stretch of the imagination could he be considered as being "in the service of the ship," but was upon his own business and pleasure remote from the vicinity of the ship. In such circumstances I believe we are bound by the decisions of the federal courts cited by respondent in which, without presently analyzing them, it is held, under facts much more favorable to the claimants in those cases than the facts shown in the present case that there was no liability.

It is not my understanding of our decision in *Moss* v. *Alaska Packers' Association,* Number 1665 of our record, that it stands as authority for the recovery of damages in every case where a seaman, whatever his capacity, is injured without fault on his part, while on shore leave. The Aguilar case, upon which we mainly relied in our decision in the Moss case, and cited now in the main opinion, does not so hold and is careful in its language to limit its holding to the particular facts of the case before the court. The liability of the ship owner for injury and damage is confined to such injury and damage as is suffered by the seaman while in the service of the ship.

In the instant case there is not, in my opinion, shown the remotest connection in that respect and for that reason I believe the judgment appealed from should be reversed.